Today's cases will be called, as previously announced, and the times will be as allotted to counsel. The first case today is No. 25-1268, Alyssa E. Warner v. Amgen, Incorporated, et al. At this time, would counsel for the appellant please come to the podium and introduce herself on the record to begin? Good morning, and may it please the Court. My name is Abby Ogdenbin. I'm here on behalf of Plaintiff and Appellant Alyssa Warner. Ms. Warner and her husband are here with the Court today, along with members of their family, in recognition that today would have been Lucas's 30th birthday. With the Court's permission, I would like to reserve three minutes for a brief rebuttal. You may. The District Court's dismissal of Alyssa Warner's claims against Amgen following the death of her son Lucas warrant reversal. The Court applied the wrong legal standard and erred in its factual findings. For Amgen to succeed in its impossibility affirmative defense, a defense the Supreme Court has repeatedly stressed is demanding and narrowly drawn, Amgen must present clear evidence that the FDA fully informed of the justifications for the warnings Ms. Warner seeks, informed Amgen that it would reject a label that included those warnings. Amgen has not and cannot meet this burden. As stated in Wyeth and reiterated in Albrecht, fully informed means record evidence that Amgen supplied the FDA with an evaluation or analysis concerning the specific dangers that would have merited the warning sought. Passing attention by the FDA is simply insufficient. The record here supports nothing more than passing attention to the cerebrovascular risks posed by Amavig and the risks posed by only a partial disclosure of the relevant medical exclusions from the studies establishing its safety and efficacy. Didn't FDA personnel propose as a possibility a label that would specifically warn regarding the cerebrovascular risk? Your Honor, what the record reflects concerning the warning is that the FDA gave passing attention to a theoretical cerebrovascular and cardiovascular risk. Following that disclosure of a theoretical warning, the FDA engaged in an analysis of the cardiovascular risks posed by Amavig as a result of its vasodilatory properties, excuse me. Following that analysis, the record is quite clear that the warning was rejected only because of the findings concerning cardiovascular risk. This is in the record. Counsel, it really sounds like you're criticizing the FDA process in this pre-approval period, not so much the submissions of Amgen to the FDA. Is that going to be a fruitful challenge if you're really criticizing the FDA? That doesn't seem like it would be particularly helpful to your position. Judge Lopez, our position is and has always been that Amgen failed to warn Alyssa and Lucas Warner. How and whether the information got before the FDA informs only the impossibility analysis that Amgen raises as a defense. What separates this case from, for example, Celexa, where the plaintiff's issue was with the FDA's acceptance of studies that were fully before it, is the fact that this wasn't before the FDA. As the court pointed out in the Zofran case, in a footnote, how it got before the FDA is really of no matter here. The problem that the plaintiff raises is not that Amgen failed to submit it or committed some type of fraud on the FDA, but that Amgen failed to warn Lucas and Miss Warner. And that having failed to make its evidentiary showing that the FDA was fully informed of this risk, it cannot now cloak itself in immunity where the record doesn't support it. Quite simply, the preemption analysis is only concerned with FDA action when there is a clear conflict. There's no clear conflict here because the FDA simply didn't address this issue. Miss Warner takes no qualms with what Amgen did or did not submit. But instead, as instructed by the Albrecht court, and reiterated in this case by this court in Zofran, is concerned with what the record was before the FDA, regardless. Doesn't it seem clear that the FDA specifically turned its attention to cerebrovascular risks from any use of a CGRP antagonist? And so when they turn their attention to that risk, it seems very difficult for us to say, well, they didn't consider it. You do have an argument, as I understand it, that there was some seven or nine studies that you submitted with your proposed amended complaint. And what is it in those studies that the FDA did not consider that have some causal association with the specific risks you say should have been warned of? Yes, Your Honor. Looking, turning to the record evidence, for example, a JA384, the entire analysis and description of the CGRP inhibiting qualities of amoebic are limited to cardiovascular. Every study, it was actually sent to the cardiac division within the FDA. There is no record evidence that there is any consideration of any studies or any analyses, as required by Albrecht, concerning the cerebrovascular risks. Well, let me ask you, it might be more helpful if you just assume without conceding that we would read the FDA study as saying the FDA did turn its attention and did mention numerous times cardiocerebral risk. If we assume that, then you need to show there was some information regarding the nature or the frequency or severity of that risk that the FDA was unaware of that they could have been made aware of during the one-month interval. Yes, Your Honor. And what is that? I would point the court to the Basali study, which is at JA4437. One of the primary findings of the Basali study is that the heart and the brain and the function of CGRP in the heart and the brain are different. And this is critical because what the FDA told us during its review of the cardiovascular risk is that it had found no evidence that there was any difference. It points to an absence of evidence. The NAI submitted by Ms. Warner shows that this is inaccurate. The brain and the heart process CGRP differently. And if you look at the court's order in this case, one of its primary findings was that the reason the FDA found that the cardiovascular risk was theoretical enough to not warrant a label was because of compensatory mechanisms in the heart. Basali and the ZHAI studies both show that this is not the case in the brain. Further, the Basali and Luau studies also show that there is an additional risk in the brain that was not raised or considered by the FDA because it's not present in the heart. The risk that is different from vasodilation is the risk to the blood-brain barrier. The reason this matters is because doctors found that Aymovig passed through Lucas's blood-brain barrier, leading to his brain injury and death. Counsel, I wonder if you would turn your attention to the post-approval issue. You just referred to the ZHAI study. I believe the district court acknowledged that that study, again focusing on the post-approval process, established what the district court characterized as a tenuous relationship between a drug with the effect of the drug at issue here and the kind of consequences we saw. I take your point to be that to fully explore that relationship, both with respect to the ZHAI study and the other eight or nine studies submitted, that the court really should have allowed the case to go forward with the benefit of expert testimony, if you will, or expert submissions that would have allowed the kind of analysis that only experts could do. I have to acknowledge that that seems to have some force. Would you just elaborate a bit on why you think the district court failed to acknowledge that it was engaged in an exercise of analysis that really required some consideration of expert testimony? Yes, Your Honor. I think that's exactly the point with the ZHAI case. What the court found when finding it was too attenuated was basically the court said, look, your allegations are that Lucas died from a seizure. I would point the court to the fact that at JA-19, stroke is listed as a cause of death for Lucas, so stroke is relevant here. But more importantly, all of this damage to Lucas's brain, the crossing of the blood-brain barrier, the ischemia, could be caused by seizure and stroke. Seizures can cause strokes. Strokes can cause ischemia, which is a lax of oxygen to the brain. And what the studies that we have identified have showed, including the ZHAI study, are that when CGRP is inhibited in the brain, the blood-brain barrier becomes more permeable. And if you look at the LUZ study and the ZHAI study, it shows that when the blood-brain barrier is more permeable, it can lead to catastrophic effects. But even engaging in this discussion, as you point out, Judge Leif-Lippez, is very difficult without the aid of medical testimony and expert testimony linking the cause of death and the deep factual findings in these studies themselves and sorting this all out. One thing that is particularly problematic in this case is that the court denied a motion to our request to amend and instead allowed only supplementary briefing wherein she said she did not want full-fledged briefing on whether or not this was NAI and then dismissed on that basis. The plaintiff would submit that justice requires her to be able to amend her complaint and that's similar to the cases before this court, the Zofran case, the cases in front of the Supreme Court, the Wyeth case, which went to verdict, the Albrecht case, which went up to the Third Circuit and was at MS, the motion for summary judgment. That given the fact and sensitive nature of the preemption inquiry, these are really questions that are not appropriately resolved at the motion to dismiss. Well, to be fair, the district court was entertaining a request to add an amendment to the complaint to add additional information which had been available earlier and so there was some burden on you and the court seemed to me gave you the benefit of the doubt of saying it would still consider whether that was futile or not and honed in on what it thought was the weak point. That's correct, Your Honor. I see I'm out of time, but if I may have a moment to address your question. In that supplemental briefing, I thought you argued that it was NAI that the studies were. We did, but we did not present full-fledged briefing. As you can see from the complexity of both our conversation and the briefing submitted to this court, a full-fledged analysis of whether it's NAI simply cannot be cabined to five pages over nine studies. And to your point, Your Honor, because Amgen raised this as an affirmative defense, while the facts might have been knowable to plaintiffs, they didn't become relevant until the motion to dismiss with the preemption affirmative defense was raised and the case law cited in our motion has a discussion of the burden when it's raised as an affirmative defense to be answered in the initial complaint. Thank you. Thank you, counsel. Thank you, counsel, at this time. And counsel for the apologies, please introduce herself on the record to begin. Good morning, Your Honors, and may it please the court, Jessica Ellsworth for Amgen. This court should affirm Judge Kobik's carefully reasoned decision finding that the plaintiff's claims here are preempted. The plaintiff's complaint asserted that the label FDA approved for Amavig when it approved the drug was insufficient under Massachusetts law because the approved label didn't do two things. One, it didn't describe categories of people who were excluded from the clinical studies that Amgen had conducted, and two, it didn't contain a warning, quote, as to the complications suffered by Lucas, end quote, i.e. that the drug could cross the blood-brain barrier and cause seizures. You can see that at paragraphs 92 to 94 of the complaint. That theory is preempted under a straightforward application of this court's decision in Selexa, which held that FDA is the exclusive judge of what goes on to an initial label at the time a manufacturer's right to market that drug comes to fruition. And that after that approval, state law failure to warn claims can certainly be available for plaintiffs who want to say that a manufacturer had an obligation to amend that complaint to add warnings that weren't there. Here, there is no question that FDA knew about Amgen's clinical trial exclusions, that FDA analyzed whether those exclusions affected the generalizability of the results of those clinical trials, and that FDA rejected including a warning on Amavig's label about a theoretical cerebrovascular risk after finding that that risk was hypothetical and unsupported by evidence. One of the plaintiff's claims here has to do with the pre-approval process, and Selexa and the other cases that have been cited are post-approval inquiries. Is there anything this court needs to have in mind? Does the pre-approval nature of those claims make anything different for us in terms of interpreting Selexa or Albright or Wyeth for that matter? I appreciate that question, Judge Montecalvo, because I think there is actually a really important line drawn in Selexa on this very issue. The reason Selexa focused on two studies that post-stated the FDA approval and only those two studies was because everything else the court said fell into this period of time when FDA was the exclusive judge of what went on the initial label. So the only thing that could have been a subject of unilateral action by a manufacturer were things that could have potentially triggered the CBE regulation. But the CBE, the definition of newly acquired information refers to information that was not submitted to the FDA, so it seems to me that allows for the potential that there could be information, the pre-existed FDA approval, that was never submitted to the FDA and that could be raised under the CBE regulation. I agree with you, Judge Chiata. I think that is correct if the information— So our focus really isn't on pre-approval, post-approval. Our real focus is after the date of the approval, was there any information that was never submitted to the FDA which had it been submitted would have resulted in some change or not? I agree, Judge Chiata, and that is why the question that Judge Kobik addressed was to look at these nine articles that were submitted by the plaintiffs, several of which did predate the approval, to determine if any of them met the standard for newly acquired information. In this case, Judge Kobik went out of her way to note that this is a really unusual request to find these articles to be newly acquired information when none of the articles talk about Amivig at all. So unlike a case like Zofran, where this court was actually looking at animal studies conducted in Japan that were about the drug at issue and trying to determine whether they were newly acquired information, here these articles were not about Amivig. They weren't even about a drug in the same class of drugs as Amivig. As I understand it, I think what I understand the plaintiff's argument to be is that yes, the FDA was aware of the protective effects of a protective effect of CRCP, specifically I think it's called vasodilation, but I think their argument is that the FDA was unaware of and didn't consider the fact that there were other protective mechanisms of CRP and CRGP, and that that's what you need to show would have not resulted in any change in the label. So, Your Honor, as I understand their argument, it is that these additional articles would have given, in that one-month period between when Amivig was approved and when Mr. Lucas took the drug, in that one-month period, Amgen would have had a sufficient basis, a reasonable evidentiary basis, to conclude that there is a causal association between using Amivig and seizures from the drug crossing the blood-brain barrier. And one of the things Judge Kobik pointed out is that not a single one of these articles says anything about a CRGP inhibitor crossing the blood-brain barrier and causing seizures. Not a single one. Many of them don't even mention CGRP at all, and to the extent they do, they are talking about the fact that there could be some neuroprotective aspects of that substance. That is what FDA recognized. And here we have FDA specifically saying that, and this is on JA385, the theoretical risk of ischemia, meaning harm from loss of blood supply, from a CGRP blockade will not be included in the label. That is because the Division of Neurology consulted with the Division of Cardiovascular and Renal Products, consulted with FDA's Medical Policy Council. They looked at the body of evidence that existed and determined that there was no evidence that CGRP was not one of the redundant mechanisms the body has for these same protective effects. And specifically said that we could, this is quoting, FDA said we can locate no information to suggest the same, meaning that it's redundant, is not true for the cerebral, the renal, and other circulation. So if someone is saying, wait, you should be careful before you do a label with a CGRP antagonist, and someone says why, and you say because CGRP protects through mechanism one, and the FDA looks at that, I think the proposition is that what the FDA didn't look at when it decided whether the risks of a CGRP antagonist were, it didn't look at the fact that CGRP also has another protective, number two mechanism, and that had the FDA known of that, it might have required some further disclosure of risk. So, Your Honor, there is a disconnect in the description that you just provided and the plaintiff's theory here, because the plaintiff's theory is not that CGRP was somehow protective, and that protective ability was lost from taking Amivig. Their theory is that the drug crossed the blood-brain barrier and caused seizures. And there is nothing in any of these studies that points to seizures resulting from CGRP inhibition. There just isn't. And so this is a case that actually I think is a pretty straightforward case to resolve under the definition of NAI, newly acquired information, which requires evidence, a reasonable evidentiary basis of a causal association between the drug, Amivig, at least another CGRP inhibitor drug, and seizures, which are the hazard that they say resulted from the use of this drug. Let me take you back to Judge Lopez's earlier question. Before I open the briefs in this case, I'd never heard of CGRP. Some of the terms, I'm still not sure I can pronounce correctly. Why should we be the ones who are trying to read these expert studies and see what they have to do with the CGRP antagonist instead of getting informed by perhaps competing expert testimony that would explain what they're doing? I hear you saying the CGRP itself crossed the barrier and caused the injury. And so I hear the plaintiff saying, well, the CGRP allowed something else to do it because of its absence. So, Your Honor, I think that this is a pretty straightforward case in this sense. If you look at the plaintiff's complaint, the complaint is very clear that it says the CGRP crossed the blood-brain barrier and caused seizures. And those seizures are what harmed Mr. Lucas. That is their theory that is in their complaint. There is nothing in these nine articles that talks about amavig, anything from this class of drugs, or causing seizures. At most, these articles, I think, talk about some neuroprotective qualities that CGRP might have. That is exactly what FDA was analyzing. On your question about experts, I think this Court's decision in Zofran answers that. Because in Zofran, this Court rejected both the idea that a regulatory expert and a scientific expert could provide those missing links because whether something is newly acquired information is ultimately a legal question in the determination of the preemption defense. And so under Zofran, I think that the courts, they have a number of paragraphs in the decision walking through why both the regulatory expert and the scientific expert were insufficient to overcome the court's own view of what the material showed. Counsel, just because that's a legal issue doesn't mean that the legal determination should not be informed by a more complete analysis that experts might provide. I do want to turn, really picking up on Judge Kayada's point about perhaps the importance of expert testimony in establishing the possible applicability of studies that do not directly involve the amavig drug. It may be possible, nevertheless, to draw inferences with respect to those studies about how it might apply to the phenomenon at issue in this case. The district court did a very thorough analysis. It's a very thoughtful opinion. But for example, I'm returning to the ZEIS study. We have a statement like this. The study does not address whether its findings about mice with a CGRP deficiency generalized to drugs like amavig that are CGRP antagonists. That very proposition about how that study of mice might generalize to humans seems to me a very difficult judgment for a court to make without the benefit of expert testimony. In addition to that, how do you reconcile that conclusion with the standards that a court is supposed to apply on a motion to dismiss? It seems like it is drawing inferences against the non-moving party, which is not compatible with the motion to dismiss standard. And that's where I'm having problems with the way in which the district court analyzes. So it would be helpful to me for you to respond to that. So Judge Lopez, I think the answer to that is that Judge Kobik was looking to see whether there was a plausible allegation that these studies met the standard for newly acquired information. And that plausibility burden is something that the plaintiff has in every case.  Excuse me, but the causality question is really a subset of the newly acquired information. If there's no causal relationship between the articles that are cited and the phenomenon at issue here, then there's no reason to go beyond and figure out, well, when were these articles available? That becomes irrelevant, right? So, Your Honor, the standard for newly acquired information has to be an article that reveals a different risk or different severity of risk than what was already before FDA. And so a plaintiff has to show there's something new and different in these articles, different from what FDA already considered. It already looked at animal studies. It already looked at the vasodilation that happens from CGRP. And it came to the conclusion that there are redundant control mechanisms that do not warrant a warning on the label. So it is up to the plaintiff to identify something new that is linked to this drug, to this particular adverse event that the plaintiff argues there should have been a warning about. And here it is really important. And you can ask the Plaintiff's Counsel on rebuttal, which of these articles give any information about a CGRP inhibitor causally associated with a seizure? I think their answer will be none. If there are no further questions, I see my time is up, Your Honors. Thank you very much. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellant please reintroduce herself on the record? She has a three-minute rebuttal. Good morning. Abby Ognebin on behalf of the Appellant. I would like to start by addressing Judge Lippez's conversation about the role of experts in this case before addressing some of the conversations with Judge Montecalvo and Judge Kayada about what the proper question in front of the Court here is concerning the fully informed FDA. Turning to the Zofran case, I think it's important to point out exactly what was going on with the expert in the Zofran case and why their role in the NAI was very different from the role here. As the Court in the Zofran case found at 340, the problem with the expert opinion was that the expert sidestepped the relevant question, the content of the studies. He hadn't even looked at what was submitted to the FDA, first what is new, and been able to apply an expert opinion about what the delta was and whether it established NAI, including sufficient causation. Instead, his opinion was all of these studies, all animal studies should always be sufficient. So I don't think the Zofran expert question is on point here. I'd like to talk a little bit about what the operative question before the Court is. Judge Kayada, as you pointed out, the real question here is not at what time the misconduct occurred. The Supreme Court has been clear. There is a duty to craft and a duty to maintain, and it stays with the manufacturer at all times. The relevant question is whether the FDA was fully informed of the justification for the warning. The record here has no evidence that the FDA was informed about the risks to the blood-brain barrier. To be very clear, the plaintiff's theory is that the FDA only looked at this in another setting, which the GWO study, G-U-O, says is completely different and lacks the compensatory mechanisms. The brain lacks the compensatory mechanisms that are in the heart, and it looked Does that go to the question your opposing counsel suggested you need to ask or answer? Does that study contain any causal association with seizures? Does it connect seizures to what it's talking about? I would respectfully submit that the seizures are a little bit of a red herring. As Judge Montecalvo pointed out, the connection between what caused a seizure and whether that caused ischemia in the brain, which is really what these studies are worried about, which is most often seen in stroke, is undeveloped on this record. We haven't heard from a medical expert, but if you look at the death certificate at JA-19, stroke is a cause of death. Nearly every single one of these articles is talking about ischemia and stroke. Aymovig was also listed as a cause of death. I would point the Court to the Sorby-Adams case where it says that CGRP stabilizes the blood-brain barrier and thus would make permeation less likely. I thought the amended complaint focused on seizure as the relevant mechanism. Seizures were caused by Aymovig crossing the blood-brain barrier, but stroke is also listed as a cause of death. There has simply been no expert opinions given in this case to Judge Lippes's point about the exact causative chain that led to the ischemia and scarring and extensive brain damage that led to Lucas's death. You wanted a risk disclosure in the label, as I understand the complaint, of one, that the studies excluded persons having certain characteristics, and two, seizure. If the studies have nothing to do with seizure, then where are you left? I don't think it's a fair characterization that the studies have nothing to do with seizure. What the studies show is that when CGRP is inhibited in the brain, as Aymovig does, it makes persons who are susceptible to serious brain injury, including stroke, and I would submit seizure, vulnerable. It makes their blood-brain barrier vulnerable. Which study discusses seizure risk? I am not sure that any of them specifically reference seizure. Instead, they're going kind of a step above and talking about ischemic events. And it's not in the record because there's no medical evidence, but seizures can occur after an ischemic event, such as a stroke or an issue with the blood-brain barrier. So without the assistance of a medical expert at this point, or a chance to amend, it's difficult to connect the ischemic events, the lack of oxygen to the brain, which is what is discussed here, with the cause of injury. But I would point the court to both the finding that Aymovig crossed Lucas's blood-brain barrier, that he died of Aymovig, and that he died of a stroke, which is an ischemic event, which all of these studies discuss. Thank you for your time, and I encourage a reversal of the lower court's finding. Thank you very much. Thank you, counsel. That concludes argument in this case. Why are you leaving me standing? I'm not going to look at the dust. I'm going to look at you. Oh, okay.  I think we're coming in.